UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JOHN McDERMOTT and SPACE
HUNTERS, INC.,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-16-09

                              Plaintiffs,                    08 Civ. 7524 (PKC)

          -against-                                          MEMORANDUM
                                                             AND ORDER

NEW YORK METRO LLC, DAILY NEWS
L.P., TIMES NEWS WEEKLY, COURIER-
LIFE, INC., AVALON EQUITY
PARTNERS LLC, NEWSDAY LLC, AM
NEWS CORP., EL DIARIO, LLC,
VILLAGE VOICE MEDIA, INC., and NYP
HOLDINGS, INC.,

                              Defendants.
-------------------------------------------------------x
P. KEVIN CASTEL, District Judge:

          John McDermott ("McDermott") and Space Hunters, Inc. ("Space

Hunters") bring this action seeking declaratory relief, injunctive relief, compensatory

damages, punitive damages and attorneys' fees under the Fair Housing Act ("FHA"),

Title VIII, of the Civil Rights Act of 1968, as amended, 42 U.S.C. § 3601 et seq.

Plaintiffs allege that defendants violated section 804(c) of the FHA, 42 U.S.C. § 3604(c),

by publishing advertisements "that indicated preferences, limitations and discrimination

based on race, color, religion, sex, handicap, familial status or national origin." (Second

Amended Complaint ("Compl."), at ¶ 81.)

          Defendants Metro New York, Inc. (incorrectly sued as "New York Metro

LLC"), Daily News, L.P. (sued as "Daily News L.P."), Courier-Life, Inc., Newsday LLC,

AmNews Corp., El Diario, LLC, Village Voice, LLC (incorrectly sued as "Village Voice

Media, Inc."), and NYP Holdings move to dismiss the Second Amended Complaint (the

"complaint"), pursuant to Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim upon which relief may be granted. Defendants argue that plaintiffs lack standing to bring their claim under Article III of the Constitution and that, with respect to certain defendants, plaintiffs' claims are time-barred, barred by administrative preclusion, and precluded by the Communications and Decency Act, 47 U.S.C. § 230. For the reasons explained below, defendants' motion is granted and the action is dismissed for lack of jurisdiction.[1]

I.    Background

The following facts, taken from the complaint and plaintiffs' supporting submissions, are accepted as true for purposes of the Court's jurisdictional review.

Plaintiff John McDermott is a "fair housing tester and the sole shareholder and officer of [Space Hunters]." (Compl. ¶ 4.) Space Hunters is a New York corporation "engaged in the business of room rental information vending." (Id. ¶ 5.)[2]

Space Hunters "sells lists, or catalogs, of rooms for rent in the boroughs of Queens, the Bronx, and Brooklyn." (Opp. at 3.) "The service performed by [Space Hunters] is the production of a catalog of available rooms pursuant to a customer's

---

[1] Defendants move to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., on the ground that plaintiffs lack standing to sue. As further explained below, a motion to dismiss for lack of standing under Article III of the Constitution should have been made pursuant to Rule 12(b)(1), Fed. R. Civ. P. See, e.g., Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006) ("Although we have noted that standing challenges have sometimes been brought under Rule 12(b)(6), as well as Rule 12(b)(1), . . . the proper procedural route is a motion under Rule 12(b)(1).") (citations omitted). The Court deems defendants' motion to have been so made.

[2] Although not material to any issue presented on this motion, the Court notes that McDermott has been described as an "FHA recidivist" by the Second Circuit. United States v. Space Hunters, 429 F.3d 416, 428 (2d Cir. 2005). In Space Hunters, the Second Circuit vacated the dismissal of six claims brought against McDermott and Space Hunters under various sections of the FHA. The Court specifically commented, in response to defendants' argument that they should have been granted judgment as a matter of law on the Government's surviving claim, that "[t]he jury heard a virtual tsunami of evidence that defendants did treat disabled people generally—and [one particular caller] specifically—differently from non-disabled people." Id. at 429. The Court also vacated the district court's decision to strike a claim for punitive damages, noting that the "record [was] awash with evidence of 'egregious' and 'outrageous' acts by defendants that could support an inference of the requisite 'evil motive'" necessary to justify a punitive award. Id. at 428.

description of his/her desired location." (Id.) To create these catalogs, plaintiffs identify potential listings from a variety of sources and contact the property owners for "permission to market their rental." (Id.) "The greatest sources of information for incorporation into [Space Hunter]'s catalogs are the classified sections of metropolitan newspapers." (Id.)

Each of the defendants in this case owns and publishes a newspaper "which offered, and continues to offer, a classified real estate section." (Compl. ¶¶ 6-15.) All ten defendants maintain places of business in the greater New York City metropolitan area. (Id.)

The complaint alleges that each defendant's newspaper published "facially discriminatory advertisements," or accepted such advertisements for publication, on certain dates between April 2005 and August 2008. (Id. ¶¶ 18, 24, 31, 37, 40, 43, 49, 52-54, 57, 63, 69, 75.) The complaint further alleges that, beginning in 2005, plaintiffs filed administrative complaints with the Department of Housing and Urban Development ("HUD") against all defendants, except the New York Post, for publishing the allegedly discriminatory advertisements. (Id. ¶¶ 20, 26, 33, 39, 45, 51, 59, 65, 71; McDermott Decl. ¶ 4.) HUD referred the complaints to the New York State Division of Human Rights ("SDHR") and the SDHR issued a determination of probable cause in each case. (Compl. ¶¶ 20, 26, 33, 39, 45, 51, 59, 65, 71.) McDermott later "requested dismissals of the administrative proceedings for administrative convenience," and he asserts that "[t]hose requests were made expressly for the purpose of bringing a [f]ederal court action." (McDermott Decl. ¶ 5.)

3

Plaintiffs assert a single claim for relief against all ten defendants under 42 U.S.C. § 3604(c), which prohibits the publication of discriminatory advertisements for the sale or rental of a dwelling. (Compl. ¶¶ 80-82.)[3] With minor variations in wording, plaintiffs allege identical injuries with respect to each defendant: they allege that, "at all relevant times, [Space Hunters] was a business competitor in the metropolitan room rental market and, as such, was economically injured by [defendants'] acceptance of facially discriminatory advertisements," and they further allege that "[p]laintiffs have suffered, and continue to suffer, great and irreparable loss, damage and injury as a proximate result of the acts and conduct of [defendants], as set forth herein." (Compl. ¶¶ 22-23, 29-30, 35-36, 42, 47-48, 56, 61-62, 67-68, 73-74, 78-79.)[4]

II.  Discussion

The Court begins its analysis of defendants' motion with their standing argument, because if standing is lacking, then the court is without jurisdiction to consider other arguments for dismissal. Article III standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 222 (2d Cir. 2008) (quotation and citation omitted); see

---

[3] Section 804(c) of the FHA provides, in relevant part:

> As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful--

> . . . To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

[4] Plaintiffs do not allege that Space Hunters was a business competitor of Courier-Life or Newsday/amNY, but they do allege that they have suffered "great and irreparable loss, damage and injury" as a result of acts, conduct and omissions by those two defendants. (Compl. ¶¶ 42, 56.)

4

also Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 929 (2d Cir. 1998) (explaining that federal district courts are "duty-bound . . . to address the issue of subject matter jurisdiction at the outset"); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998) (stating that there is no doctrine of "hypothetical jurisdiction"); Merritt v. Shuttle, Inc., 187 F.3d 263, 269 (2d Cir. 1999) ("The existence of subject matter jurisdiction goes to the very power of the district court to issue . . . rulings . . . .").

A.     Governing Law

1.   Rule 12(b)(1)

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff . . . but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), petition for cert. filed, __ S.Ct. __, 2009 WL 789199 (U.S. June 1, 2009) (No. 08-1191) (quotations and citations omitted).

In deciding a Rule 12(b)(1) motion, the Court is free to consider materials outside the pleadings. Id.; see also State Employees Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 77 n. 4 (2d Cir. 2007) ("[t]he distinction [between a Rule 12(b)(6) motion and a Rule 12(b)(1) motion] is significant: while we must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), . . . we have held that, in adjudicating a motion to dismiss for lack of subject-matter

jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits") (citation omitted). Indeed, "once the [d]efendants' motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) put[s] the [p]laintiffs' Article III standing in issue, the [d]istrict [c]ourt has leeway as to the procedure it wishes to follow." Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 87-88 (2d Cir. 2006) (footnotes omitted) (citing Gibbs v. Buck, 307 U.S. 66, 71-72 (1939)) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court.").

### 2. The standing doctrine

"Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.' That case-or-controversy requirement is satisfied only where a plaintiff has standing." Sprint Commc'n Co., L.P. v. APCC Servs., Inc., __ U.S. __, 128 S.Ct. 2531, 2535 (2008). To have standing under Article III, a plaintiff must adequately establish:

> (1) an injury in fact (i.e., a "concrete and particularized" invasion of a "legally protected interest");
>
> (2) causation (i.e., a "fairly . . . trace[able]" connection between the alleged injury in fact and the alleged conduct of the defendant); and
>
> (3) redressability (i.e., it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992)) (quotation omitted). "While all three of these elements are constitutionally mandated, the injury-in-fact element is often determinative." See Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 138 (3rd Cir. 2009). "Under it, the plaintiff must suffer a palpable and distinct

harm." Id. (citing Allen v. Wright, 468 U.S. 737, 751 (1984)). The injury must be "concrete and particularized," as well as "actual or imminent," and must not be "conjectural" or "hypothetical." Lujan, 504 U.S. at 560 (citations omitted).

The requirement that a plaintiff have suffered a concrete and particularized injury in order to bring an action guarantees that the complaining party has a "personal stake" in the outcome of the litigation. Baker v. Carr, 369 U.S. 186, 204 (1962); see Lujan, 504 U.S. at 560 n. 1 ("the injury must affect the plaintiff in a personal and individual way"). "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).

B.    Application

Plaintiffs allege nearly identical injury with respect to each of the ten defendants. As against Metro NY, Daily News, Times News Weekly, New York Press, AmNews, El Diario, The Village Voice, New York Post, they allege that "[Space Hunters] was a business competitor in the metropolitan room rental market and, as such, was economically injured by [defendant's] acceptance of facially discriminatory advertisements." (Compl. ¶¶ 22, 29, 35, 47, 61, 67, 73, 78.) Plaintiffs further allege that they have "suffered, and continue to suffer, great and irreparable loss, damage and injury as a proximate result of the acts, conduct and omissions" of all defendants. (Compl. ¶¶ 23, 30, 36, 42, 48, 56, 62, 68, 74, 79.) Finally, plaintiffs allege that McDermott "was, and continues to be, a fair housing tester" (Compl. ¶ 4), though they do not indicate that McDermott ever contacted the authors of the advertisements at issue or acted on those

advertisements in any capacity. These three basic allegations comprise the whole of the complaint's injury-in-fact showing.

Plaintiffs expand upon their allegation of injury in the Opposition and in the McDermott Declaration. The Opposition states that "[s]tanding is asserted by virtue of plaintiffs' status as readers," and McDermott asserts in his Declaration that defendants' role in allowing discriminatory landlords to recruit their preferred classes "is an injury psychologically and financially particular to [McDermott] and [Space Hunters]." (Opp. at 2, 5, 9; McDermott Decl. ¶ 9, at 4.) McDermott also notes, in the final paragraph of his Declaration, that plaintiffs' "clientele" is "overwhelmingly comprised of protected class members." (McDermott Decl. ¶ 10.) The Court assumes, for purposes of its analysis, that this statement is intended to assert plaintiffs' standing in some representative capacity.

Accepting plaintiffs' allegations and related factual assertions as true, the Court identifies four alternate theories of standing in plaintiffs' submissions. None is sufficient to satisfy the requirements of Article III in this case.

1. Plaintiffs' competitor claims do not assert particularized injury-in-fact.

The Supreme Court has recognized that, in certain circumstances, a plaintiff may satisfy the injury prong of a constitutional standing analysis by alleging economic or political injury as a competitor. See In re United States Catholic Conference, 885 F.2d 1020, 1028-31 (2d Cir. 1989) (citing Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 403 (1987); Investment Co. Inst. v. Camp, 401 U.S. 617, 620 (1971); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 46 (1970) (per curiam); Ass'n of Data Processing Serv. Orgs. Inc. v. Camp, 397 U.S. 150, 151 (1970)). "Implicit in the

reasoning of those opinions," however, "is a requirement that in order to establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the [defendant]." Id. at 1029. Only then does the plaintiff satisfy the rule that he has been personally disadvantaged by a defendant's actions. Id.

Plaintiffs do not identify any case law that applies the doctrine of competitor standing to an FHA claim. The Court notes, however, that the theory's application in this case is problematic for a more basic reason. Plaintiffs allege that Space Hunters was a "competitor in the metropolitan room rental market" and that it was economically injured by defendants' alleged acceptance of facially discriminatory advertisements. But plaintiffs do not set forth any "concrete" or "particularized" factual allegations to show how Space Hunters "personally competes in the same arena with [defendants] . . . ." Id. The complaint does not, for example, indicate how ten general news publications containing classified listings could qualify as competitors to a subscription real estate service that provides tailored room rental catalogs for individual customers. Moreover, plaintiffs state in their Opposition that Space Hunters relies on major metropolitan newspapers, like those owned by defendants, to provide the source listings for its catalogs. (Opp. at 3.) Accepting this explanation as true, the Court cannot credit plaintiffs' simultaneous contention that the publication of particular listings by those newspapers would detract from plaintiffs' ability to produce a catalog comprised of such listings. [5]

---

[5] The Court notes, but does not rely upon, plaintiffs' recent submission to the Second Circuit in Space Hunters, which described Space Hunters' business as follows: "[d]efendants do not 'show' these rooms to individuals; defendants do not advertise any specific room on behalf of the owner; defendants are not paid or compensated by the owner in any way whatsoever; and the receipt of Space Hunter's fee is not dependent upon the closing of any particular transaction." (Defs.-Appellees Br. at 8-9, United States v. Space Hunters, Inc., 429 F.3d 416 (2d Cir. 2005) (No. 02-6313), available at 2005 WL 3948367). "Defendants provide a list culled from want-ads to individuals for a set fee; nothing more and nothing

9

McDermott asserts a second, alternative theory of competition in his Declaration by stating that: "[t]he specific injury that I have sustained due to the defendants' publication of facially discriminatory advertisements is the loss of a potential market due to defendants' endorsement of prohibited landlord practices." (McDermott Decl. ¶ 9, at 3-4.) According to McDermott, "[a] landlord subject to the Fair Housing Act who has discriminatory intent and who desires to further that intent will place his listing with the defendants, who have demonstrated their willingness to publish facially discriminatory advertisements, and not with [Space Hunters], which advertises rooms with no descriptive language whatsoever." (Id. at 4.) McDermott's statement contradicts the business model description in plaintiffs' Opposition by suggesting that a landlord would choose either to publish in defendants' newspapers or to list its property with Space Hunters. But it also suggests that McDermott has standing to proceed as an aggrieved person under the FHA because he has been denied the opportunity to compete for business from those "landlord[s] subject to the Fair Housing Act who [have] discriminatory intent and who desire[] to further that intent." (Id.) If this is in fact what McDermott seeks to allege, he seems to have misunderstood the purpose of the FHA, which is to deter discriminatory housing practices and not to protect the economic interests of "competitors" seeking equal access to a pool of landlords who seek to discriminate.

If McDermott means to assert that defendants' violation of the FHA has produced anti-competitive effects in his industry, he must still satisfy the constitutional requirement of a particularized injury sufficient to bestow standing in this case. In

less." Id. at 9. Plaintiffs' self-description in Space Hunters appears to further disqualify them as potential competitors to the defendants in this case, who are alleged only to own and operate newspapers that sell classified advertisements. See Compl. at ¶¶ 1, 6-15.

United States Catholic Conference, the Second Circuit declined to recognize competitor standing for plaintiffs who alleged injury as a result of the "unequal enforcement" of federal tax-exempt status requirements in the Internal Revenue Code. 885 F.2d at 1028-29. The "essence of [plaintiffs'] charge," the Court explained, was that "the IRS' non-enforcement of the Code create[d] an uneven playing field, tilted to favor the [defendant]." Id. at 1029. Noting that plaintiffs had, by their own admission, chosen not to match the defendants' illegal electioneering with their own, the Court emphasized that the plaintiffs' competitor claims lacked particularized injury-in-fact. Id. at 1030. "By asserting that an advantage to one competitor adversely handicaps the others," the Court reasoned, the "plaintiffs ha[d] not pleaded that they were personally denied equal treatment." Id. Even assuming, then, that the plaintiffs in this case do not intend to allege unfair exclusion from a market for discriminatory listings, their general statement of economic damage does not indicate how they personally sustained "actual" or "imminent" competitive injury as a result of defendants' alleged FHA violations.

### 2. Plaintiffs do not have standing as "ordinary readers" of defendants' newspapers.

Plaintiffs assert in their Opposition that they were "damaged as ordinary readers" of the alleged discriminatory listings and that, through this injury, they have standing to pursue a section 804(c) claim. (Opp. 5; see also id. at 9.) To support their theory of "reader" standing, plaintiffs ask this Court to read the Second Circuit's decision in Ragin v. Harry Macklowe Real Estate Company ("Ragin II"), 6 F.3d 898 (2d Cir. 1993), as establishing a "broad rule that any reader of a discriminatory advertisement, regardless of intent or lack of intent to buy or rent, has standing under § 3604(c) of the Fair Housing Act." (Opp. at 5.) In Ragin II, the Second Circuit read section 804(c) to

11

redress unintentional discrimination and injury to newspaper readers who were not active in the real estate market. This Court does not, however, understand the Second Circuit's analysis in Ragin II to permit claims under section 804(c) by an individual plaintiff who alleges no economic or emotional injury whatsoever.

In analyzing whether McDermott has standing as an "ordinary reader" under Ragin II,[6] it is useful to begin with the cases that precede Ragin II and then discuss Ragin II itself.

The Second Circuit's treatment of private party standing under section 804(c) relies on several principles outlined in Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). In Havens, the Supreme Court considered whether two individual plaintiffs, one African American and one white, had standing to sue under section 804(d) of the FHA in their dual capacities as (i) "testers" and (ii) individuals deprived of the benefits of interracial association. 455 U.S. at 373.[7] Emphasizing that section 804(d) outlawed misrepresentations made to any person because of race, color, religion, sex, or national origin, the Court determined that Congress had "conferred on all 'persons' a legal right to truthful information about available housing." Id. The Court noted its own prior recognition that "[t]he actual or threatened injury required by Art. III may exist solely by

---

[6] Space Hunters is a non-natural person and is incapable, itself, of reading. It cannot have sustained personal injury sufficient to confer standing in the precise manner that plaintiffs' Opposition suggests.

[7] Section 804(d) of the FHA provides as follows:

As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful--

... To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 U.S.C. § 3604(d).

virtue of 'statutes creating legal rights, the invasion of which creates standing,'" and it concluded that section 804(d) amounted to such an enactment. Id. (quoting Warth v. Seldin, 422 U.S. 490, 500 (1975)). "A tester who has been the object of a misrepresentation made unlawful under § 804(d)," the Court reasoned, "has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the [FHA]'s provisions." Id. at 373-74. Because the injury at issue stemmed exclusively from a speaker's action, the Court concluded that a tester's standing under section 804(d) could not be negated by the tester's expectation that he would receive false information or by the absence of any real intention, on the tester's part, to actually buy or rent a home. Id. at 374. Applying this standard, the Court concluded that the African American tester plaintiff had satisfied the requirements for standing under section 804(d) by alleging that petitioners lied to her about the availability of certain apartments on four different occasions. Id. The white tester, however, who alleged only that he was accurately informed of availabilities on each occasion that he inquired, had not alleged any discriminatory misrepresentation and could not, therefore, demonstrate standing under 804(d) or plead a cause of action under that subsection's provisions. Id. at 374-75.

Turning to the allegation of "neighborhood standing," the Havens Court considered the scope of a plaintiff's indirect, "third-party standing" to challenge unlawful steering practices under section 812 of the FHA. Respondents alleged that petitioners' racial steering practices had deprived them of "the right to the important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory

housing practices." Id. at 376. Petitioners did not dispute that the loss of social, professional and economic benefits through racial steering could constitute palpable injury, but they argued that respondents had only alleged residence in the "Richmond metropolitan area" and so failed to demonstrate how steering practices in the county at issue might have affected the particular neighborhoods where respondents lived. Id. at 377. The Court concluded that, although respondents had not identified the particular neighborhoods in which they lived, or the proximity of their homes to the site of the alleged steering practices, it could not say, as a matter of law, that no injury could be proved. Id. The Court instructed the district court to provide an opportunity for a more definite allegation of standing on remand. Id. at 377-78.

Nine years after Havens, the Second Circuit reviewed and affirmed the denial of a motion to dismiss a "reader" claim under section 804(c). Ragin v. New York Times Co. ("Ragin I"), 923 F.2d 995 (2d Cir. 1991). The Ragin I plaintiffs included four individual African American newspaper readers who had "been looking for housing in the New York metropolitan area" and who alleged injury as a result of the publication of real estate advertisements indicating a preference based on race. "Because [s]ection [804(c)] validly prohibits the publication of real estate ads that 'indicate[] any preference . . . based on race,'" the Second Circuit reasoned, and because "the complaint [could] fairly be read to allege that the Times ha[d] published such ads," dismissal of the claims under Rule 12(b)(6), Fed. R. Civ. P., was inappropriate. 923 F.2d at 998. As part of its review, the Court summarized the "general, and fairly obvious," elements of section 804(c)'s prohibition and explained that "the statute prohibits all ads that indicate a racial preference to an ordinary reader whatever the advertiser's intent." Id. at 1000.

14

Ragin I did not include an analysis of private party standing under section 804(c). But the Second Circuit did note plaintiffs' allegation that "the ads in question discourage[d] black people from pursuing housing opportunities by conveying a racial message . . . ." Id. at 1003. The Court also acknowledged the defendant's argument that damages claims for "emotional injury resulting from the ads in question" would prove numerous and overwhelming, and it commented as follows: "[t]he problem is that a claimant may establish a prima facie case for such damages simply by oral testimony that he or she is a newspaper reader of a race different from the models used and was substantially insulted and distressed by a certain ad." Id. at 1004-05. The Court added that "[t]he potential for large numbers of truly baseless claims for emotional injury thus exists," but it rejected this as a reason to immunize publishers from liability under section 804(c). Id. at 1005.

The Second Circuit addressed section 804(c) again two years later, in Ragin II. On appeal from a judgment entered after a bench trial with an advisory jury, the defendants in Ragin II argued that the district court had erred when it found that four individual plaintiff readers had standing to sue a leasing and managing agency, along with the agency's sole owner and president, for violations of section 804(c). According to the defendants, the individual plaintiffs could not have suffered an injury sufficient to confer standing because they were not in the market for housing when they read the advertisements in question. 6 F.3d at 903-04. The Second Circuit responded to defendants' argument by expressly assuming, for purposes of its review, that the plaintiffs "were not actively looking for an apartment when they viewed the defendants' ads." Id. at 904. The Second Circuit summarized the Supreme Court's treatment of

tester standing under section 804(d) in <u>Havens</u> and it explicitly approved the district court's reference to <u>Havens</u> in the opinion below. The Court quoted Judge Sweet's legal conclusion—that "a plaintiff who proves that she read the challenged advertisements and that the advertisements would indicate a racial preference to the ordinary reader 'has suffered injury in precisely the form the [FHA] was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions'"—and it stated flatly that it "agreed." <u>Id.</u> "There is no significant difference," the Court explained, "between the statutorily recognized injury suffered by the tester in [<u>Havens</u>] and the injury suffered by the [plaintiffs], who were confronted by advertisements indicating a preference based on race." <u>Id.</u>

   The Second Circuit's adoption of <u>Havens</u> in <u>Ragin II</u> does not, however, amount to the broad holding that plaintiffs now urge. Although the Second Circuit's opinion did not discuss plaintiffs' allegation of emotional distress, Judge Sweet did incorporate those allegations into his finding of injury below. In a section of the district court opinion entitled "Application of the Law to the Facts," Judge Sweet found as follows: "the [i]ndividual [p]laintiffs have proved that they were injured by the [d]efendants' ads in that they received ads violative of their right to nondiscriminatory real estate advertising which caused them substantial offense and emotional distress." 801 F. Supp. 1213, 1232 (S.D.N.Y. 1992). Because Judge Sweet's injury finding relied in part on plaintiffs' proof of offense and emotional distress, the Second Circuit's affirmance of that finding does not amount to a holding that readership alone would suffice to establish injury and thereby confer standing under section 804(c).[8] In fact, the

---

[8] <u>See</u> Hon. Pierre N. Leval, <u>Judging Under the Constitution: Dicta About Dicta</u>, 81 N.Y.U. L. Rev. 1249, 1257 (2006) ("The distinction [between a court's holding and dictum] requires recognition of what was the

Second Circuit's review of standing in Ragin II addressed only the question presented: whether individual plaintiff standing under section 804(c) requires actual participation in the real estate market. The Court concluded that no such requirement existed and held that Judge Sweet's finding of standing for the four individuals before him was not, therefore, erroneous. But neither the Court's approval of the broad language quoted from Havens, nor its comment that it had "explicitly rejected the argument that a showing of discriminatory intent or discriminatory effect is required to prove a prima facie violation of section 804(c)," 6 F.3d at 906 (citing Ragin I), expanded this holding past the limits of Judge Sweet's finding. The issue raised by plaintiffs in this case was never before the Court.[9]

More recently, the Second Circuit revisited the scope of section 804(c) in a case that also involved both McDermott and Space Hunters. In United States v. Space Hunters, the Second Circuit reversed the dismissal, under Rule 12(b)(6), of six claims brought under the FHA against then-defendants McDermott and Space Hunters for discrimination based on race and disability in the New York City room rental market. 429 F.3d at 419. The district court had concluded that 804(c) applied exclusively to statements by a dwelling owner or its agent and that the Government could not therefore state a claim for the violation of 804(c) against McDermott and Space Hunters. Id. at 424. The Second Circuit rejected this conclusion and commented that section 804(c)'s purpose is not limited to "prevent[ing] expressions that result in the denial of housing."

---

question before the court upon which the judgment depended, how (and by what reasoning) the court resolved the question, and what role, if any, the proposition played in the reasoning that led to the judgment. A dictum is not converted into holding by forceful utterance. . . .").

[9] Plaintiffs appear to acknowledge as much in their Opposition. See Opp. at 8 ("Defendants are correct in that plaintiffs do not have any factually comparable case to offer the Court.").

Id. at 424-25. "The statute also 'protect[s] against [the] psychic injury' caused by discriminatory statements made in connection with the housing market." Id. at 424-25 (citing Robert G. Schwemm, Discriminatory Housing Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision, 29 Fordham Urb. L.J. 187, 250 (2001) and HUD ex rel. Stover v. Gruzdaitis, No. 02-96-0377-8, 1998 WL 482759, at *3 (HUD ALJ Aug. 14, 1998)).[10] To emphasize the breadth of section 804(c)'s reach, the Court noted that it had permitted recovery in Ragin II "even when the plaintiffs were not in the market for housing." Id. at 425. The Space Hunters Court did not, however, address the question of individual standing under section 804(c).

Given the Second Circuit's limited treatment of standing under section 804(c), this Court concludes that a person who reads a discriminatory advertisement has standing to sue only if they allege some form of personal injury, including psychic injury or substantial insult or distress. Without such an allegation, the plaintiff does not have

---

[10] The article cited in Space Hunters identifies three "judicially recognized purposes" to section 804(c): (i) reducing barriers that might deter minorities seeking homes; (ii) protecting minority home seekers from suffering insult, emotional distress, and other intangible injuries; and (iii) helping break down the notion that illegal discrimination continues to permeate America's housing markets. See 29 Fordham Urb. L.J. at 250. Each of these purposes reflects a continued focus on discrimination-related injury in the application of section 804(c).

The same article also discusses the specific question now before this Court. In a passage that was not cited by the Second Circuit, Professor Schwemm explains:

> There is a real question . . . whether § 3604(c) was intended "to confer a legal right on all individuals to be free from indignation and distress" caused by discriminatory housing statements. In § 3604(c) cases involving discriminatory advertising, courts have generally held that the mere receipt or observation of such ads is sufficient to confer standing on a minority reader, although one important opinion suggested that standing could be established only if reading the ad deterred the plaintiff from seeking particular housing. The concern in these cases is that a particularized injury to the plaintiff must be shown and that an individual who is merely exposed to a discriminatory ad cannot be distinguished from countless other potential claimants who may also have seen the ad.

Id. at 310-11 (citing Spann v. Colonial Vill., Inc., 899 F.2d 24, 29 n. 2 (D.C. Cir. 1990) (Ginsburg, J.) (questioning whether § 3604(c) created universal standing independent of economic or emotional injury), Ragin I and Ragin II).

"such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction." Havens, 455 U.S. at 378-79 (citation and internal quotations omitted).

In reaching this conclusion, the Court notes that several appellate courts faced with arguments similar to the one raised by plaintiffs have expressed skepticism at whether Congress intended 804(c) to confer universal standing on all prospective "reader" plaintiffs. See, e.g., Fair Hous. Council of Suburban Philadelphia v. Main Line Times, 141 F.3d 439, 443-44 (3rd Cir. 1998) ("The fact that a housing organization is able to show that a particular advertisement violates the [FHA] is not sufficient to satisfy the requirements of Article III; a violation of the Act does not automatically confer standing on any plaintiff, even one who holds the status of a private attorney general."); Wilson v. Glenwood Intermountain Props., Inc., 98 F.3d 590, 596 (10th Cir. 1996) ("[M]ere receipt by plaintiffs of the discriminatory advertisements in this case could cause only the kind of 'abstract stigmatic injury' held insufficient to establish standing in Allen, 468 U.S. 737," where the "Court concluded stigmatic injury must be suffered as a direct result of having personally been denied equal treatment in order to confer standing."); Spann v. Colonial Vill., Inc., 899 F.2d 24, 29 n.2 (D.C. Cir. 1990) (Ginsburg, J.) ("Although '[t]he actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing,"' . . . we question whether Congress intended 804(c) to confer a legal right on all individuals to be free from indignation and distress."). These assessments are not binding on the Second Circuit or on this Court, but they do confirm the uncertainty of universal "reader" standing under 804(c), and the Second Circuit has incorporated at least one of the

decisions into its own analysis. See Ragin II, 6 F.3d at 904 (citing Spann v. Colonial Vill., Inc., 899 F.2d at 27).

Because McDermott does not claim that he suffered any personal injury, including psychic injury or substantial insult or distress, his allegation of standing as "an ordinary reader" cannot satisfy the requirements of Article III in this case.

### 3. McDermott does not have standing as a tester.

As noted above, the Supreme Court has expressly recognized standing under section 804(d) of the FHA for housing "testers." The Court defines testers as "individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices." Havens, 455 U.S. at 373. Plaintiffs attempt to invoke the "tester" doctrine by describing McDermott as a "Fair Housing tester" (Compl. ¶ 4), but they do not allege any facts to support this title. Plaintiffs do not allege, for example, that McDermott "pose[d] as [a] renter[] or . . . collect[ed] evidence of unlawful steering practices." Havens, 455 U.S. at 373. Instead, plaintiffs allege only that (i) McDermott read the newspaper and that (ii) "the status of tester is informal in the sense that, although it is traditionally based on training, it requires no license." (Opp. at 4.) Plaintiffs ignore the basic requirement that a "tester" must, at a minimum, actually "test" listings or advertisers in order to attain his "tester" status. More important, plaintiffs also fail to recognize that their claim for injury from facially discriminatory listings could not, by its nature, invoke the "tester" doctrine.

4. Space Hunters does not have standing as an organizational representative.

Like individual plaintiffs, organizations seeking to assert standing under the FHA must allege "such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction." Havens, 455 U.S. at 378-79 (citation and internal quotations omitted). Where an organization asserts standing in a representative capacity, the organization must allege, at a minimum, that its members would otherwise have standing to sue in their own right, that "the interests at stake are germane to [its] purpose, and [that] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." See Fair Housing in Huntington Comm. v. Town of Huntington, 316 F.3d 357, 363 (2d Cir. 2003) (citations omitted). Plaintiffs' passing reference to a "clientele" of "protected class members" does not satisfy even these minimal requirements.

Because plaintiffs do not support their general claim of injury with any allegations or assertions sufficient to indicate an actual or imminent, "particularized" or "concrete" injury-in-fact, the Court concludes that they have not satisfied the minimum constitutional requirements for standing to bring their FHA claim. The complaint must be dismissed as a result.

III.    Leave to Amend

Plaintiffs have requested leave to amend in the Conclusion of their Opposition to defendants' motion. (Opp. at 15.) They do not identify any facts that they would allege if such leave were granted.

Plaintiffs commenced the instant action on August 26, 2008 and amended once as of right on November 13, 2008. (Dkt. Nos. 1, 29.)[11] On December 8, 2008, after partial service of plaintiffs' first amended complaint, plaintiffs and the eight served defendants wrote to the Court and brought to the Court's attention the defendants' view, among other things, that plaintiffs lack standing because they are not aggrieved parties. The Court held a conference on December 15, 2008 and, in an Order prepared as a result of the conference, gave plaintiffs until December 31 to advise whether they wished to amend their complaint. (Order of December 15, 2008, Dkt. No. 28.) In its Order, the Court noted that failure to amend "at this juncture will be an important consideration in whether leave to replead is granted in the event the motions to dismiss are granted." (Id.) Plaintiffs submitted a letter response to the defendants' pre-motion correspondence on December 31, in which they directly addressed defendants' arguments regarding standing. In a ten-page reply dated January 9, 2009, defendants reiterated their arguments that plaintiffs lacked standing. (Dkt. No. 31.) On January 12, 2009, the Court granted plaintiffs leave to amend by memorandum endorsement to plaintiffs' December 31 letter. (Order of January 12, 2009.) The same day, the Court also set a briefing schedule for defendants' prospective motion to dismiss the new complaint. (Dkt. No. 31.) Plaintiffs filed their Second Amended Complaint on February 2, 2009. (Dkt. No. 33.)

Because plaintiffs have not set forth any proposed amendment and have had ample opportunity to amend to cure any defect in their allegations in support of standing, their request for leave to file a third amended complaint is denied.

---

[11] Plaintiffs did not file the first amended complaint, which is dated November 13, until December 23, 2008. (Dkt. Nos. 24, 29.)

IV.    Conclusion

For the foregoing reasons, defendants' motion to dismiss the Second Amended Complaint for lack of subject matter jurisdiction is granted under Rule 12(b)(1), Fed. R. Civ. P., and leave to further amend is denied.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 15, 2009